7 Cal.Rptr.3d 768 (2003)
114 Cal.App.4th 747
In re JACKLYN F., a Minor.
Harvey F. et al., Petitioners and Respondents,
v.
Noel B., Objector and Appellant.
No. C043859.
Court of Appeal, Third District.
December 22, 2003.
Gail C. Schulze, Aubum, for Objector and Appellant.
Sherrill R. Linker for Petitioners and Respondents.
DAVIS, J.
Noel B. (appellant), the mother of Jacklyn F. (the minor), appeals from the trial court's order granting a petition filed by the minor's paternal grandparents (the grandparents) to terminate appellant's parental rights based on abandonment. (Fam.Code, §§ 7820, 7822;[1] Cal. Rules of Court, rule 39.1A(a).) Appellant raises a variety of challenges to the trial court's factual and legal findings.
We shall conclude that the requirements for abandonment under section 7822 were not met because the minor was not "left" in the custody of another for the period of *769 time required by the statute. Accordingly, we shall reverse the termination of appellant's parental rights.

FACTS AND PROCEDURAL HISTORY
On October 13, 1998, the grandparents filed a petition for guardianship of the seven-year-old minor. According to the petition, the grandparents previously had legal guardianship of the minor from August 1995 until October 1997, at which time the guardianship was terminated because appellant had completed a residential drug treatment program. The grandparents alleged that appellant became homeless and had come to their home in September 1998 with the minor and the minor's half sibling. According to the petition, appellant left the children in the grandparents' care "[f]or days at a time ... without any word of where she was going or how long she would be gone." As of the date the petition was filed, appellant had been gone for three days and had called only once, and the grandparents did not know where she was or when she would return.
The grandparents were granted temporary guardianship of the minor on October 22, 1998.
The petition, and a later report by an investigator for the court, chronicled the minor's chaotic life while in appellant's care, involving exposure to domestic disputes and being left to care for her infant sibling while appellant slept. According to the investigator's report, appellant's whereabouts were unknown, and the minor's father consented to the guardianship. The minor told the investigator that she would rather remain with the grandparents than return to appellant.
In November 1998, appellant filed a responsive declaration, in which she objected to the orders sought and requested that the minor be returned "to parent." She appeared at the hearing on the grandparents' petition, and the matter was referred back to the investigator to obtain input from appellant.
Appellant told the investigator she felt the grandparents "had gone behind her back" when they filed the guardianship petition and that "she just want[ed] to get her daughter back." According to the investigator, appellant "seemed to" contend that the minor was staying with the grandparents "until [appellant] could get her life together...." The investigator continued to recommend that the guardianship petition be granted.
An attorney made a special appearance with appellant at the next hearing, which occurred on December 10, 1998. The trial court found the allegations in the grandparents' petition true and appointed them guardians of the minor. The court ordered supervised visitation for appellant, to occur once a week for six hours, and appellant was permitted to have telephone calls with the minor three times a week.
One week after the hearing, the grandparents filed an application for a restraining order against appellant in response to numerous harassing messages appellant had left on their answering machine. The grandparents sought an order restraining appellant from having contact with them or the minor, "[e]xcept that peaceful contacts by telephone and scheduled supervised visitation relating to the minor child shall be permitted."
A temporary restraining order was granted in February 1999, and was personally served on appellant. In April 1999, the trial court granted the restraining order as requested.
At a hearing in July 1999, the court ordered the parties to attempt to work out a temporary visitation schedule. According to a report prepared for the court, though granted visitation in January 1999, *770 appellant did not contact the visitation coordinator until March 1999 to schedule a visit with the minor, and she visited the minor only once, in April 1999. In August 1999, appellant was present at a hearing at which the trial court ordered "all existing orders [to] remain in full force [and] effect."
In May 2002, appellant filed a request for supervised visitation, telephone contact and counseling with the minor, utilizing a form entitled "Petition for Termination of Guardianship." The grandparents filed an opposition to appellant's petition, objecting to visitation.
In August 2002, the grandparents filed a petition for adoption of the minor, as well as a petition to terminate parental rights. They alleged the minor had been residing with them for more than a year and appellant had not been in contact with the minor or paid support for her for the preceding year. They also set forth that the minor's father was prepared to relinquish his parental rights so that the adoption could proceed.
According to an amended report prepared for the court by the probate investigator, the minor, who was in sixth grade, said she wanted to live with the grandparents "for the rest of her life" and did not want to have contact with appellant. The minor reported she had not had contact with appellant since second grade.
Appellant reported she had not used methamphetamine or alcohol for a year or more. She told the probate investigator that she felt any fears the minor had concerning contact with her were the result of "brainwashing" by the grandparents.
The minor's therapist reported she had been providing therapy to the minor for approximately six years. According to the therapist, the minor had made significant progress in therapy but she continued to have fears, including being afraid appellant would come to her school and take her. The therapist was unsure whether contact with appellant would cause the minor greater emotional harm or would help reduce her fears.
According to a report prepared for the court by a probate attorney investigator (attorney investigator), the minor said that she wanted her grandparents to adopt her because she was afraid appellant would try to "take her again." The minor said she was not going to attend the court hearing. The attorney investigator recommended that the petition be granted.
The grandparents filed a trial brief, in which they acknowledged that an agreement had been reached at a previous court hearing "that any communications to the minor by the natural mother be forwarded to [ ] the minor's therapist," who would determine whether they should be provided to the minor.
At the hearing on the grandparents' petition, which occurred in March 2003, the grandmother testified that there had been an order in place since January 1999 allowing appellant to visit the minor once a week, but appellant had visited the minor only once. The grandmother acknowledged that, since 1999, the minor's therapist had given her letters that appellant had written to the minor. However, none of the letters were shown to the minor and the minor was not told that appellant had tried to contact her, because the minor "was struggling with her own problems then." The minor's attorney recently gave the minor three letters from appellant, which the minor threw out.
The grandmother testified that the minor was attending therapy because she had problems sleeping and being left alone. According to the grandmother, the minor was concerned that appellant would "show[ ] up somewhere and tak[e] her." *771 The minor's father and grandfather also testified to the minor's fears in this regard.
The minor's therapist testified that it was "imperative" that the minor be adopted by the grandparents "for her to continue the growth and development that she has achieved." The therapist felt the minor was genuinely afraid of living with appellant, and that she was not repeating what she had heard from other people.
The therapist testified she had received "a number of" letters from appellant, only some of which she had read. She said it was a difficult decision as to whether to give the letters to the minor, not because the letters were "bad," but because the therapist did not feel the minor was ready "to accept any kind of reaching out by [appellant]." The therapist kept the letters she received until the minor's appointments, at which time she would give them to the grandparents. According to the therapist, when she did not see the minor for a while, she would have "a stack" of letters to turn over. However, in 2002, the therapist received only one letter from appellant, and there had been no letters in 2003.
Appellant testified that, the last time she was in court, she was told she was not allowed to have any contact with the minor except by mail. According to appellant, she was instructed to mail letters to the minor's therapist, who would screen them. Appellant testified she wrote letters to the minor and sent them to the minor's therapist or her attorney. Appellant testified she had visited the minor twice since October 1998. She asserted that she did not know she was allowed to visit the minor, "[o]therwise, [she] would have visited [her]." Appellant denied being served with the restraining order that the grandparents had obtained (which stated that she continued to have visitation rights), and she thought she may have been incarcerated on the date indicated on the proof of service.[2]
Appellant testified she did not apply earlier to reestablish visitation because she had relapsed into drug use and "wasn't ready to see" the minor. According to appellant, she had needed to work on herself and she had only been in a condition to see the minor for the last year.
The trial court received into evidence the April 1999 restraining order, which stated that appellant could continue to exercise her visitation rights as previously ordered. The court also took judicial notice of the visitation order from the guardianship file, which reflected that the order for visitation and telephone contact had remained in effect as of the last hearing in the matter. Also admitted into evidence were the probate investigator's report, the attorney investigator's report and a letter from the minor's therapist. The trial court took the matter under submission.
By written decision, the trial court found the evidence was sufficient to support a presumption of abandonment. The court noted appellant had not requested visits with the minor between 1999 and May 2002 and found appellant's testimony, that she believed there was an order suspending visitation, was "not convincing." The court found "[t]he testimony about letters sent to the minor and the frequency of that correspondence [to be] less than clear" and that the correspondence "represent[ed], at best, a token effort to communicate." The court also found "there was absolutely no evidence of any attempts at support by [appellant] over the years."
*772 The court observed that the minor was thriving in the care of the grandparents and that the minor's therapist believed adoption would be in the minor's best interest. The court noted that the minor's desires in this regard were "clear and uncontroverted." Accordingly, the court granted the grandparents' petition to terminate parental rights.

DISCUSSION
The trial court terminated parental rights based on its determination that the evidence was "sufficient to support the presumption of abandonment." Section 7822 describes the circumstances under which a child may be freed from parental custody and control based on abandonment. As relevant to these proceedings, section 7822 provides: "(a) A proceeding under this part may be brought where the child ... has been left by both parents or the sole parent in the care and custody of another for a period of six months ... without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child. [¶] (b) The ... failure to provide support, or failure to communicate is presumptive evidence of the intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents." (Italics added.)
"`"In order to constitute abandonment there must be an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same."' [Citations.]" (In re Brittany H. (1988) 198 Cal.App.3d 533, 549, 243 Cal.Rptr. 763.) Accordingly, the statute contemplates that abandonment is established only when there is a physical act  leaving the child for the prescribed period of time  combined with an intent to abandon, which may be presumed from a lack of communication or support. The elements of abandonment for purposes of section 7822 are delineated as follows: (1) the child must be "left" by a parent in the care and custody of another person for a period of six months; (2) the child must be left without any provision for support or without communication from the parent; and (3) the parent must have acted with the intent to abandon the child. (In re Cattalini (1946) 72 Cal.App.2d 662, 665, 165 P.2d 250 (Cattalini).)
The threshold issue that must be addressed in this matter is whether the minor was "left" within the meaning of the statute. The fact that a parent has not communicated with a child for a period of six months or that the parent intended to abandon the child does not become material under section 7822 unless the parent has "left" the child.
In Cattalini, supra, 72 Cal.App.2d at page 665, 165 P.2d 250, the appellate court discussed former Welfare and Institutions Code section 701, which contained a similar requirement that a child must be "left" for a specified period of time in order to constitute abandonment. In Cattalini, the children had been placed by a court order in the custody of their mother, whose new husband was willing to adopt them. (Id. at p. 664, 165 P.2d 250.) Noting that to "leave" connotes a voluntary action (id. at pp. 665-666, 165 P.2d 250), the appellate court held: "[I]t may not be said that appellant left his children in the care and custody of the respondent when, by an order of the court, they were taken from the joint control of their parents and placed in the sole care and custody of the mother." (Id. at p. 665, 165 P.2d 250.)
*773 The court in Cattalini relied on precedent established by our Supreme Court that a judicial order taking custody of a child cannot support a finding of abandonment. (Matter of Cozza (1912) 163 Cal. 514, 527, 126 P. 161 (Cozza), disapproved on another ground in In re Adoption of Barnett (1960) 54 Cal.2d 370, 378, 6 Cal.Rptr. 562, 354 P.2d 18.) Construing another predecessor statute (former Civ.Code, § 224), the court in Cozza stated that an abandonment required an "`actual desertion,'" as well as an intent to abandon the child. (Cozza, supra, at p. 528, 126 P. 161.) The court concluded that, where the care and custody of the child is taken away from the parent by order of the court without the consent of the parent, there is no abandonment. (Id. at pp. 528-529, 126 P. 161.)
In In re Jones (1955) 131 Cal.App.2d 831, 281 P.2d 310, the appellate court followed Cattalini and Cozza and affirmed the trial court's judgment dismissing a "Petition for Freedom from Custody." In that case, the father had been awarded custody of the couple's child pursuant to a modified custody decree. (Id. at pp. 832-833, 281 P.2d 310.) The mother and father lived in different cities. (Id. at p. 833, 281 P.2d 310.) There was evidence that the mother, who was mentally ill, had failed to demonstrate any interest in the child over a two-year period. (Id. at pp. 833, 834, 281 P.2d 310.) Noting that the mother did not voluntarily leave the child in the care and custody of the father, the court held that the evidence supported the trial court's conclusion that the mother had not abandoned the child. (Id. at p. 836, 281 P.2d 310.)
In this case, in supplemental briefs on the question of whether the minor was "left" within the meaning of section 7822, both parties set forth the proposition that a judicial "taking" of a child can be converted to a "leaving" by parental nonaction. We are cognizant that numerous appellate cases have concluded that the leaving requirement for abandonment may be satisfied by evidence of parental nonaction. (See, e.g., In re Jack H. (1980) 106 Cal.App.3d 257, 264, 165 Cal.Rptr. 646; In re Jacqueline H. (1979) 94 Cal.App.3d 808, 816, 156 Cal.Rptr. 765; In re Morrow (1970) 9 Cal.App.3d 39, 52, 88 Cal.Rptr. 142, disapproved on other grounds in Hollister Convalescent Hosp., Inc. v. Rico (1975) 15 Cal.3d 660, 673-674, 125 Cal.Rptr. 757, 542 P.2d 1349; In re Conrich (1963) 221 Cal.App.2d 662, 666-667, 34 Cal.Rptr. 658; In re Barton (1959) 168 Cal.App.2d 584, 588, 336 P.2d 210; In re Maxwell (1953) 117 Cal.App.2d 156, 162-165, 255 P.2d 87.) However, none of these cases provides any analysis or rationale for this conclusion, and they rely on evidence that the parent has failed to communicate with or support the child for the requisite "leaving" period to establish such "parental nonaction." We do not agree that evidence of a failure to communicate or support for the statutory period of time can, in itself, satisfy the separate statutory requirement that the child be "left" for a prescribed period of time.
Section 7822, subdivision (b), states that the failure to communicate with or support a child is presumptive evidence of the intent to abandon. However, intent is only one of the statutory elements that must be proved to establish abandonment. The statute also requires that the child be "left" for a specified period. (Id., subd.(a).) Were we to construe the statute as permitting evidence of a failure to communicate or support to establish that the child has been "left," this would render some of the statutory language surplusage, because it would not matter how the child came to be in the care of another if the parent failed to communicate with or support the child. "`"A construction making *774 some words surplusage is to be avoided."'" (Los Angeles County Dept. of Children & Family Services v. Superior Court (2003) 112 Cal.App.4th 509, 516.)
Furthermore, as the failure to support or communicate is presumptive evidence of the intent to abandon, the required elements to establish abandonment would, in effect, be reduced to one were we to interpret the statute to also permit this evidence to establish the "leaving" element. Such interpretation would be inconsistent with rules of statutory construction, and would not comport with the sanctity of the relationship between a natural parent and child that our laws have traditionally recognized. (See Cozza, supra, 163 Cal. at p. 524, 126 P. 161.)
And, although we do not discount the possibility that, under different circumstances, it might be proper to conclude that a parent has "left" a child within the meaning of section 7822 despite court intervention, we conclude this is not such a case. When the grandparents filed the petition for guardianship, the minor had been left in their care for only three days. Just over a month later, appellant was present at the hearing on the grandparents' petition for guardianship, and she contested the petition. She also filed an opposition to the guardianship petition, seeking return of the minor to her custody. Similarly, she told an investigator for the court that she wanted the minor returned to her and that the minor was only staying with the grandparents until she was able to get her life together.
Appellant contested the grandparents' efforts to secure a court order taking custody of the minor from her. Once the guardianship was granted, appellant was no longer legally entitled to custody of the minor without further court order. At such point, the minor's custody status became a matter of judicial decree, not abandonment. We conclude that appellant's conduct following the granting of the guardianship  which included sending "stacks" of letters to the minor but failing to visit her  did not constitute "parental nonaction" amounting to a leaving. As already discussed, "parental nonaction" must involve more than merely failing to communicate in order to give meaning to the statutory language requiring that the minor be "left." Consequently, we conclude there is insufficient evidence in this case to support a finding that appellant "left" the minor for the requisite time period.
We are mindful of the predicament of well-intentioned and responsible caretakers, such as the grandparents here, who are left to care for children without the legal authority to do so. However, it is these circumstances that the juvenile dependency laws are particularly well-suited to address. Had the grandparents sought assistance from the juvenile court, dependency proceedings could have been initiated, which would have allowed appellant a limited time period to get her act together. (Welf. & Inst.Code, §§ 300, 361.5, subd. (a).) If appellant was unsuccessful, the minor would be entitled to a permanent plan of adoption absent compelling circumstances. (Welf. & Inst.Code, § 366.26, subd. (c)(1).)
We conclude the evidence before the trial court was insufficient to establish that the minor was left in the custody of the grandparents for six months, a requirement under section 7822 for a finding of abandonment.[3]

*775 DISPOSITION
The order terminating parental rights is reversed.
We concur: SIMS, Acting P.J., and RAYE, J.
NOTES
[1] Further undesignated section references are to the Family Code.
[2] Appellant testified she was incarcerated for eight and one-half months ending, she "believe[d]," in February 2000.
[3] As we resolve the matter in appellant's favor on this ground, we find it unnecessary to address the issues raised in her opening brief. Supplemental briefing was received and considered on the dispositive issue.